907 P.2d 783

**Gene Francis STUART, Petitioner–Appellant,**

v.

**STATE of Idaho, Respondent.**

No. 20060.

Supreme Court of Idaho,
Boise, January 1994 Term.

Feb. 21, 1995.

Rehearing Denied Jan. 8, 1996.

Robert E. Kinney, Orofino, for appellant.

Larry EchoHawk, Atty. Gen., and Lynn E. Thomas, Deputy Atty. Gen., Boise, for respondent. Lynn E. Thomas argued.

BISTLINE, Justice.[1]

This is an appeal by Gene Francis Stuart (Stuart) from the denial of his second petition for post conviction relief in which he alleged that his telephone calls from the Clearwater County Jail to his attorney(s) had been impermissibly monitored or taped. After an evidentiary hearing, the district court denied Stuart's petition, concluding that Stuart had failed to carry his burden of proof. Because we hold that there is not substantial and competent evidence to support the district court's finding that the intentional destruction of portions of the relevant telephone logs was not attributable to the state, such that a spoliation inference should be applied in Stuart's favor, we reverse.

## PRIOR PROCEEDINGS

In 1982, Stuart was convicted of First Degree Murder By Torture for the beating death of a three-year-old child, Robert Miller. Stuart was sentenced to death. The conviction and sentence were upheld on direct review in *State v. Stuart*, 110 Idaho 163, 715 P.2d 833 (1985).

Stuart's first petition for post-conviction relief was denied by the district court and this Court affirmed the denial (in a subsequently withdrawn opinion). The Court denied Stuart's petition for rehearing and issued a substituted opinion in *Stuart v. State*, 118 Idaho 865, 801 P.2d 1216 (1990).

Stuart then filed this second petition for post-conviction relief, alleging that the Clearwater County Sheriff's Department had intruded upon his confidential conversations by taping and/or monitoring his attorney-client phone calls. The district court summarily dismissed Stuart's second petition. On appeal, this Court reversed and remanded, holding that summary judgment on the second petition was inappropriate because there were disputed issues of material fact. *Stuart v. State*, 118 Idaho 932, 801 P.2d 1283 (1990). We requested that the district court determine: (1) whether there was recording of attorney-client conversations by the Sheriff's department; and (2) whether Stuart's constitutional rights were violated. The Court

---

1. Justice Bistline authored this opinion prior to his retirement on December 1, 1994.

stated that if the district court found that Stuart's attorney-client conversations had been recorded, the State must show that the evidence at trial had an origin independent of the eavesdropping. *Stuart*, 118 Idaho at 935, 801 P.2d at 1286.

## THE DISTRICT COURT'S RULING

In conducting the proceedings on remand, the district court bifurcated the inquiries that this Court ordered. The district court directed the parties to first present evidence relevant to the question of whether any of Stuart's phone calls to or from his attorney(s) were monitored or tape recorded, indicating that the question of whether Stuart's constitutional rights had been violated would only be reached if Stuart satisfied his initial burden of proving that recording or monitoring of these calls had occurred. Because the district court ultimately concluded that Stuart had not satisfied his burden of proof, the evidence presented was limited to the threshold question of whether or not taping or monitoring of attorney-client communications had occurred.

In remanding the case to the district court, we held "that there is a triable issue of fact as to whether the conduct of [Stuart] and Mr. Matson [an attorney in Washington who had represented Stuart in past] established an attorney-client relationship." The district court began its analysis with that question and found that in fact an attorney-client relationship existed during the period immediately after Stuart was arrested on September 19, 1981. On the basis of Matson's testimony, the district court found that during that time, Stuart made and received several calls from Matson. The district court found that Stuart discussed the death of Robert Miller and the issue of sadistic pre-disposition as an element of the murder by torture charge the state was filing against Stuart. Matson expressed concern that the state would attempt to contact two women with whom Stuart had past relationships, Teresa Jacobsen and Vicki Owens. Stuart told Matson that although he knew where they were, the state would not be able to locate them. The state did ultimately locate these two women and they

subsequently testified against Stuart at trial. On appeal, neither party takes issue with the district court's findings relevant to the existence or scope of the attorney-client relationship or attorney-client communications between Stuart and Matson.

Stuart called many witnesses in an attempt to establish that his attorney-client telephone calls had been either monitored or tape recorded. The state called many witnesses to rebut that assertion. Most of the witnesses for both sides were employees, or former employees, of the Clearwater County Sheriff's Office or Orofino County.

Evidence was adduced during the proceeding concerning a concealed microphone in a false thermostat in one of the rooms of the Clearwater County Sheriff's Department. However, the district court found that the hidden microphone behind the thermostat in the interview room was not installed or in place during the time that Gene Francis Stuart was a prisoner in the Clearwater County Jail.

The district court found that it was undisputed that one of Stuart's telephone calls, made or received by him while housed in the Clearwater County Jail, was tape recorded. The recorded conversation was between Stuart and his sister.

Emery Ray Norton testified that he did radio work for the sheriff's office and set up the equipment for this recorded call. Norton testified that, pursuant to Sheriff Albers' request, he connected one of the telephone lines with a tape recorder. Norton further testified that he disconnected this system on that same evening and never reinstalled it.

Sheriff Albers testified that, for a period of time, some of Stuart's outgoing calls (he estimated three) were monitored. Albers believed that only he and Deputy Robert Harrelson monitored these calls. On the basis of Albers' testimony, the district court found that the calls were monitored by simply being close enough to Stuart to hear his side of the conversation.[2] Albers believed that all of these calls involved conversations between Stuart and his family members. According

2. *But see,* footnote 5, *infra.*

to Albers, no attorney-client calls were to be monitored.

Albers testified that he had ordered one incoming call of Stuart's to be recorded. Albers testified that, at the time Stuart was arrested, the sheriff's office did not have the capability of recording telephone conversations until Norton connected the phone line to a tape recorder. Albers specifically testified that no conversation between Stuart and Matson was monitored or recorded.

Albers testified that no further telephone calls of Stuart were recorded, apparently based, to some extent, upon a conversation with the Clearwater County Prosecutor, Stephen Calhoun, who advised that such a practice could cause problems. Albers testified that the purpose for recording the telephone conversation of Stuart and of monitoring some of Stuart's calls was security, to protect Stuart from the public and to prevent an escape by Stuart.

Calhoun, who prosecuted Stuart, testified that Albers had informed him of the tape recorded call. His impression was that the tape recording had been made on the day that he was informed or perhaps the night before. Albers indicated to Calhoun that the purpose of the recording and monitoring was for security and discussed a pistol missing from the Stuart residence.[3] Calhoun's opinion expressed to Albers was that he did not want to interfere with security, but felt that Albers should not be monitoring or recording conversations and believed that no such activity took place after this conversation. Calhoun testified that he had no knowledge of any attorney-client conversations having been monitored or recorded.

Arvin E. Finley, a deputy for the Clearwater County Sheriff's office until his resignation in 1987, testified that he had knowledge of recordings made of Stuart's telephone calls. However, the district court found his direct knowledge was very limited. The district court pointed out that certain individuals, such as Finley, who testified at

this evidentiary hearing and gave affidavits supportive of Stuart's Petition for Post–Conviction Relief, had positions somewhat antagonistic to the Clearwater County Sheriff's Office and specifically to Sheriff Albers. The district court explained that Deputy Finley was a candidate for Clearwater County Sheriff in 1988 opposing Sheriff Albers.

Finley testified that he had heard one recorded conversation, evidently the conversation between Stuart and his sister. He further testified that on one occasion, he was present in the Clearwater County Sheriff's Office when a dispatcher told him that Stuart was on the phone and that all of his conversations were being recorded. Finley testified that he did not recall who the dispatcher was, but he did recall that the jailer was Curtis Berry (an assertion that the district court pointed out was contradicted by the testimony of Curtis Berry). The district court found that other than these occasions, Finley's information admittedly came from what others had told him.

John E. Bryant was another witness called by Stuart who the district court found had a poor relationship with the Clearwater County Sheriff's Office. Bryant was displeased when Deputy Geidl was fired, subsequently quit himself, and brought a lawsuit against Clearwater County over a dispute in wages. The district court found that Bryant's testimony regarding the recording of Stuart's telephone calls was based entirely upon hearsay and speculation. Bryant testified that it was "common knowledge" among the sheriff's staff that all of Stuart's telephone calls were to be recorded. He testified that this started a few days after Stuart's arrest, which the district court found contradicted the testimony of another witness. Bryant further testified that he had never personally participated in the recording of any of Stuart's telephone calls and believed that these recordings were for security reasons and would not include attorney-client conversations.

---

3. The district court found that it was established during the hearing that the discovery of a missing pistol would not have been until September 21, 1981. The missing pistol, therefore, could not have been a justification for recording the

telephone conversation on September 20, 1981. The district court concluded, however, that it could have been a reason argued by Albers for continuing to thereafter monitor or record the petitioner's conversations.

Gary Geidl, another witness called by Stuart, was employed as a deputy sheriff on Forest Service Patrol during the time Stuart was incarcerated at Clearwater County. He left the Clearwater County Sheriff's Office on bad terms, sued the county for back wages, and also ran against Sheriff Albers in a subsequent election. The district court found that his testimony and, prior to that, his affidavit in support of Stuart's petition, were based almost entirely upon hearsay and speculation. He did testify to having personal knowledge as to one recording of a conversation which he believed was recorded in the visitor's room rather than the interview room or by telephone. Geidl testified that he was told by a dispatcher (whose name he did not remember) that it was a conversation involving Stuart, and that he assumes the conversation was between Stuart and an attorney or a minister because the door to the visitor's room was closed. The district court found that there was no other testimony or evidence supporting recordings of Stuart being made from the visitor's room. Geidl also testified about recordings being made from a microphone hidden behind the thermostat in the interview room but the district court concluded, as stated above, that this microphone was installed after the time Stuart was incarcerated in Clearwater County.

Geidl had no personal knowledge of any capability to record prisoner telephone calls. He had no personal knowledge of any policy to record prisoner telephone calls.

Rosanne Page, another witness called by Stuart, testified that she had direct knowledge of recordings being made of telephone calls between Stuart and his attorney Mr. Kinney. Page was employed as a dispatcher from December 1, 1981, through November, 1987. She testified that, a few months after she started her employment, she was instructed by someone in authority that all of Stuart's incoming and outgoing telephone calls were to be recorded. She testified specifically that she had recorded telephone calls between Stuart and his attorneys and related one incident where Mr. Kinney, Stuart's attorney, had called, she had put him through, and then had activated the recording equipment. She testified that she had never lis-tened to any of these conversations and had no personal knowledge of their content.

The district court found there were several factors which adversely affected the weight to be given this testimony and the credibility of Page. In November, 1987, Page was fired by Sheriff Albers and then allowed to resign. She was angry about this and about the termination of Geidl (whom she lives with). Page testified that she was present during a confrontation about the taping between Georgia Berry, a former dispatcher, and Sheriff Albers. However, Berry testified that Page was not present for that confrontation. The district court concluded that a reasonable inference was that much of Page's testimony is based on what others have told her and not what she actually observed. Additionally, the district court pointed out that Page's testimony differed from that of another witness in several aspects. Finally, Page's testimony during her deposition was much less certain than her testimony in court.

Randall Everitt, an investigator from the Attorney General's Office, was assigned to investigate the allegations of the Second and Subsequent Petition for Post–Conviction Relief. He traveled to Orofino in the fall of 1988 on two occasions where he interviewed witnesses, examined documents, and made a written report. He testified that there was only the one recorded conversation made by the Clearwater County Sheriff's Office involving the petitioner, the conversation between Stuart and his sister.

The district court was disturbed by two entries, both made by jailer Curtis Berry, in the jailer's log which the district court felt were difficult to explain satisfactorily. The first entry was for the date of 10–27–81 in the 1600–2400 shift where jailer Berry made an entry which read exactly as follows:

2055–2105 Stuart made 3 phone 2 incomp. calls—Taped—Back to Cell 15.

Curtis Berry had difficulty explaining this entry to the district court's satisfaction. He had no specific recollection of why he had printed the word "taped." His opinion was that this must have meant that he was placing masking tape around an area of the jail to be painted.

In another log, on the date of 11–06–81, time 2115, Berry made the following entry (apparently regarding an inmate named Couie):

2115 incoming call for couie taped as per 2001, ...

It was established that "2001" was the identifying number for Sheriff Albers. Berry reasoned that this entry again concerned his taping off an area to protect it from painting to be done, and that he was doing this per Sheriff Albers' instruction. The district court found that Berry's testimony may or may not have been accurate.

After listening to all of the testimony in this case the district court said it could not find one way or the other with regard to the journal entries. The court ruled that it may be that these very suspicious entries actually were for taping areas to be painted. There was testimony from both sides regarding the painting activities or lack thereof at or about the time these entries were made. However, while the district court was suspicious of those entries, based upon all the evidence in this case, the court felt it could not make a finding that these entries referred to the taping of telephone conversations or the taping or monitoring of attorney-client conversations.

The district court described the missing portions of two logs for the period that Stuart was incarcerated at the Clearwater County Jail as an unsolved mystery. Based on the witnesses' testimony about the journals, the court said that the prisoner telephone log would have shown all calls placed to or from Stuart, and the dispatcher's log or radio log would have shown the activities of the dispatchers during this time period. The critical portions of both of these logs were not produced by the Clearwater County Sheriff's Office. The court described exhibit 192, a bound journal-type book used as a jail phone log book for the years 1981 and 1982. The court found that it was obvious from an examination of the book that the log sheets for the time period prior to November 26, 1982, had been torn or cut from the book. From the evidence, the district court made a finding that the log sheets of the inmate phone log and the dispatcher's log were in-tentionally removed and for that reason were not available at trial.

Gene Fish, the jail administrator at the time of Everitt's investigation, testified that these portions of the logs were definitely missing at the time he gave the logs to Everitt for the Attorney General's Office investigation. The district court found that it was probable that the missing portions were taken some time between 1982 and the fall of 1988 when they were turned over to Everitt for inspection.

The district court ruled that after considering all of the evidence, which included the testimony of numerous other witnesses in addition to those summarized above, it could not find that the removal and/or destruction of the logs was by Clearwater County or its agents. The court pointed out that it seemed unlikely that anyone wishing to hide this portion of the record would have made the removal so obvious by only partially destroying the evidence. The court also found that the logs were accessible to several individuals, including Bryant, Finley, Geidl, and Page, as well as the present members of the sheriff's staff. The court also doubted that, after Prosecutor Calhoun had informed Sheriff Albers that it was not a good idea to record prisoner telephone conversations, the written records of Clearwater County would have shown that the telephone calls of Stuart were tape recorded.

The district court therefore concluded that the spoliation doctrine did not apply and no inference or presumption existed in favor of either party; that a telephone conversation between Stuart and his sister on September 20, 1981, was the only call that was recorded; and that no attorney-client calls of Stuart were monitored.

Stuart appeals, arguing (1) that he did establish that attorney-client phone calls were tape recorded or monitored; (2) that he was entitled to a favorable spoliation inference based on the missing evidence; and (3) that his due process rights were violated by the state's failure, before the original trial, to disclose the tape-recording of his September 20, 1981, phone conversation with his sister.

## ANALYSIS

### I. Standard Of Review

■ A petition for post conviction relief is a civil proceeding governed by the Idaho Rules of Civil Procedure. *Paradis v. State,* 110 Idaho 534, 536, 716 P.2d 1306, 1308 (1986). As the petitioner, Stuart has the burden of proving by a preponderance of the evidence that his assertions are correct. I.C.R. 57(c). Credibility of witnesses and weight of testimony are matters resolved by the trial court as trier of fact and will not be set aside on appeal unless clearly erroneous. I.R.C.P. 52(a). A factual finding is clearly erroneous only if it is not supported by "substantial and competent evidence in the record." *Pace v. Hymas,* 111 Idaho 581, 589, 726 P.2d 693, 701 (1986).

### II. The District Court's Finding That The Intentional Destruction Of Portions Of The Telephone Logs Was Not Attributable To The Sheriff's Office Is Clearly Erroneous

■ The district court found that, for the period of time prior to November 26, 1982, the missing pages from the jail phone log book for 1981 and 1982, exhibit 192, as well as the dispatch radio log covering that time period, were intentionally removed. The district court found that the pages of the jail phone log had been deliberately torn or cut from the jail phone log book and that, had they not been destroyed, the missing pages would have documented Stuart's telephone activity for the relevant time period. Similarly, the district court found that the missing dispatch log would have shown the activities of the dispatchers during the relevant time period.

The district court discounted the testimony of Randall Everitt of the Attorney General's Office that the logs were intact in 1988 and instead relied on the testimony of Gene Fish, the former jail administrator, that the missing portions were definitely missing when Fish gave Everitt the logs in the fall of 1988.

The district court thus concluded it was "probable" that the missing portions were taken between 1982 and the fall of 1988.

As stated above, the district court found that Stuart had not established that the state or its agents removed or destroyed the missing log entries because of three factors: (1) that it was unlikely anyone wishing to hide this portion of the logs would make the removal so obvious by only partially destroying the evidence; (2) that it was unlikely anyone in the sheriff's office would have made a written entry documenting the taping of phone calls after the prosecutor had told the sheriff it was a bad idea to record prisoner phone calls; and (3) "[t]he logs were accessible to several individuals, including Bryant, Finley, Geidl and Page, as well as the present members of the sheriff's staff."[4]

We will review these conclusions in sequence. The first conclusion is a speculation that is not supported by substantial and competent evidence because there is no evidence in the record that anyone outside of the sheriff's office, such as the former employees, had any reason to destroy the evidence in such an obvious manner either. Although there is evidence in the record that Geidl sued for back wages and later ran for the office of sheriff, there is no explanation of why the theft or destruction of the evidence at issue in such an obvious manner did, or would have, assisted him in either endeavor (or why Rosanne Page, with whom Geidl lives, would have done this on his behalf). Likewise, there is no explanation in the record of why Arvin Finley, as a candidate for sheriff, or John Bryant, suing for back wages, would have stolen or destroyed the evidence in this manner. At best, any inference that can be properly drawn from the method of destruction is neutral, establishing nothing more than an inartful saboteur.

The second finding, a finding of the presumed contents of the missing evidence, also cuts both ways. If the missing pages contained no evidence damaging to the sheriff's

---

4. We interpret the district court's reference to the present members of the sheriff's staff as a comparative reference only because any destruction by an employee of the sheriff's office would clearly be chargeable to the state. Similarly, any destruction of the evidence by Finley, Page, Geidl, or Bryant while they were still employed by the sheriff would be conduct attributable to the state.

office, then the only motivation that the former employees would have had for destroying them assumes they had a sophisticated understanding of the spoliation doctrine and the adverse inferences that might subsequently be drawn against the sheriff's office by its inability to produce evidence within its control. There is no evidence in the record to support such a conclusion. Moreover, the district court's conclusion that nobody in the sheriff's office would have made a written entry of tape recording activity after the sheriff was advised against such taping on September 21, 1981, is at odds with the district court's own "suspicions" regarding Berry's October 27, 1981, entries in the jailer's log which used the word "taped."[5]

The third finding is the most critical. The district court's indication that, in addition to the "present members of the sheriff's staff" who had access to the records now missing, Bryant, Finley, Geidl and Page also had access to the records is not supported by substantial and competent evidence. The evidence that former employees of the sheriff's office had access to records came primarily from the testimony of Sheriff Albers. Sheriff Albers testified that the missing telephone message pad and radio logs would have been kept in the downstairs vault, unless temporarily moved to a file cabinet. He also testified that the phone log from which pages had been torn, exhibit 192, would likely have been kept in a drawer adjacent to the jailer's desk in the booking area. Other witnesses corroborated this portion of Albers' testimony. Sheriff Albers opined that any former employee who remembered the combination to the vault could have stolen the records. Similarly, he speculated that any person could

have torn the pages from the phone log by removing it from the desk at a time when no staff member was present.

There is simply no evidence in the record that Bryant, Finley, Geidl, or Page were ever in the sheriff's office after termination of their employment or that they enjoyed greater access than any other member of the general public. There is no evidence that any of these employees retained keys to the premises. As discussed above, there is no evidence of a rational motive for any of these former employees to have stolen or destroyed the records. Therefore, because the district court found that the phone records were intentionally destroyed and the record on appeal establishes that the phone records were in the exclusive control and possession of the sheriff's office at the time this took place, the district court's finding that the destruction was not attributable to the sheriff's office must be set aside as clearly erroneous. The next step in our analysis is a determination of the constitutional significance of this erroneous factual finding.

### III. Even If The Intentional Destruction Of The Telephone Logs Was Not Directly Attributable To The State, Because It Would Not Have Occurred But For The State's Discovery Violation, Stuart's Rights To Due Process Were Violated

■ As stated above, the district court found that it was undisputed that a single incoming phone call to Stuart from his sister was tape recorded on September 20, 1981. On appeal, it is agreed that, although the prosecution was aware of the existence of that tape recording at the time Stuart moved

---

5. As the district court correctly noted, it is the invasion of the attorney-client relationship which is pivotal to Stuart's claim, whether it be by tape-recording or secret monitoring. Although there is testimonial support in the record for the district court's finding that monitoring occurred by various staff members standing near inmates while they talked on the telephone, the finding is partially incorrect because Sheriff Albers testified that the "monitoring" was accomplished by picking up an extension phone and listening. See Tr. p. 1581, lines 7–12; p. 1582, lines 2–7; Tr. p. 1585, lines 7–11.

The district court's findings regarding the monitoring were also contradictory. In the same paragraph the district court found that "Sheriff Albers testified that, for a period of time, some of the outgoing calls of Stuart (he estimated three) were monitored" and "Albers knew of no outgoing calls from Stuart that were monitored."

Thus, the district court's speculation about the low likelihood that any entry in the destroyed journals would have been favorable to Stuart was based on a factual finding that was only partially correct because it ignores the possibility that the journals would have been useful in establishing telephone extension monitoring activities in addition to recording activities.

for discovery on September 21, 1982, the prosecution did not disclose the existence of the tape recording as ordered in the discovery order entered on September 30, 1982. *See* Appellant's Brief at 10; Respondent's Brief at 19.[6]

 The state argues on appeal that this failure to disclose evidence ought to be evaluated under the standard of *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). *Bagley* refined the standard of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and held that a constitutional violation for failure to disclose material evidence requires a showing of "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383.

The tape-recorded conversation between Stuart and his sister was primarily a discussion of jail visitation rules, whether to inform Stuart's mother of his arrest, and the fact that Robert Miller had died and the police were searching for implements Stuart had used to punish the boy. Thus, applying the *Bagley* standard to the undisclosed tape recording of the phone call between Stuart and his sister, it is clear that the result of Stuart's trial would not have been different because none of this discussion would lead to the suppression of evidence obtained by violating Stuart's attorney-client confidences.

However, the circumstances of this case are unique because, but for the nondisclosure of this evidence which was not material, the phone logs, evidence of unknown value, would undoubtedly have been preserved. Therefore, we must proceed to analyze whether the non-disclosure of non-material evidence has significance under the controlling standard for establishing a constitutional violation based on the destruction of evidence of unknown value.

 In *Paradis v. State*, 110 Idaho 534, 716 P.2d 1306 (1986), we outlined a three-part test for determining whether "a defen-

dant's due process rights have been violated by the loss or destruction of allegedly exculpatory evidence." *Id.* at 539, 716 P.2d at 1311. The *Paradis* test looks at "(1) whether the evidence was material to the question of guilt or the degree of punishment; (2) whether the defendant was prejudiced by the loss or destruction of the evidence; and (3) whether the government was acting in good faith when it destroyed or lost the evidence." *Id.* In *Paradis* the destroyed evidence at issue was the victim's body which had been cremated. The Court found that the government had not acted in bad faith and that Paradis was not prejudiced by the destruction of the body because a more extensive autopsy showing where the victim was killed was not relevant to Paradis' guilt or innocence. However, since our decision in *Paradis*, the United States Supreme Court has revisited the question of governmental loss or destruction of evidence, specifically with reference to evidence of unknown value.

In *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), a sexual assault case in which the failure of the police to test semen samples or refrigerate the victim's semen-stained clothing resulted in the loss of ability to analyze that evidence, the Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood*, 488 U.S. at 58, 109 S.Ct. at 337. The Court reasoned that

requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant.

*Id.* In attempting to define bad faith, the Court referred back to its earlier decision in *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), and reiter-

---

6. Although the state takes the position that this disclosure was not required by the rules of discovery, that argument ignores the fact that the

district court had entered an order requiring production. Accordingly, the state is foreclosed from making that argument at this late date.

ated that "the presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood,* 488 U.S. at 56, n. *, 109 S.Ct. at 336–37 n. *.

■ In essence, for cases where the destroyed evidence is of unknown value, the Supreme Court's decision in *Youngblood* consolidates the three considerations which were enunciated in *Paradis* through its reasoning that materiality and prejudice to the defense can be presumed where the government acts in bad faith as that term was defined by the Court in *Trombetta.* Therefore, because of the unknown value of the evidence at issue in this case, we apply *Youngblood* and restrict our inquiry to the existence of governmental bad faith.

■ Returning to the question of whether or not the prosecution's discovery violation has relevance in the destruction of evidence analysis, we draw guidance from *Youngblood.* In explaining that the government had not acted in bad faith in *Youngblood,* the Court pointed out that none of the spoiled evidence at issue was "concealed" from the defendant. *Id.* This is a clear recognition that concealment is one method of proving that the exculpatory value of the evidence was known to the government prior to its destruction.[7]

In the present case, although the prosecution did not conceal the existence of the phone logs, it did conceal the existence of the tape-recording of Stuart's phone call to his sister which, if disclosed, would have inevitably led to further discovery regarding the sheriff's surreptitious tape recording sufficient to preserve the phone logs. We believe that the failure to provide discovery regarding the taped phone call is a sufficiently proximate cause of the destruction of the phone log evidence so as to rise to the level

of bad faith under *Youngblood. Cf. United States v. Cooper,* 983 F.2d 928, 931 (9th Cir.1993) (discovery request for evidence by defense put government on notice of exculpatory value of evidence such that subsequent destruction of the evidence constituted bad faith).

■ As discussed in the previous section, the district court's finding that the intentional destruction of evidence was not attributable to the state was unsupported by substantial and competent evidence. Accordingly, having reversed that finding as clearly erroneous, such determination constitutes an independent and adequate basis apart from the discovery violation for a finding of bad faith under *Youngblood.* We next proceed to analyze the consequences of this constitutional violation.

**IV. Because The Intentional Destruction Of The Evidence Is Attributable To The State, Stuart Is Entitled To An Inference That The Destroyed Evidence Would Have Been Favorable To His Petition**

■ The district court in this case acknowledged that if the destruction of evidence was attributable to the state, the spoliation doctrine would apply in Stuart's favor. The spoliation doctrine is a general principle of civil litigation which provides that upon a showing of intentional destruction of evidence by an opposing party, an inference arises that the missing evidence was adverse to the party's position. *See McCormick On Evidence,* 4th Ed. § 265, pp. 189–94 (1992). In a criminal case, application of a favorable inference under the spoliation doctrine is the appropriate remedy for a *Youngblood* due process violation. *See State v. Dulaney,* 493 N.W.2d 787, 791–92 (Iowa 1992).

■ Although we hold that Stuart is entitled to a favorable inference regarding

---

7. The "exculpatory value" of the destroyed evidence is, concededly, indirect in this case. The evidence at issue, assuming it would have showed, or would have helped to establish, the taping or monitoring of attorney-client phone calls, would not directly have refuted the evidence of Stuart's sadistic pre-disposition. Rather, it would potentially have led to suppression of

evidence of Stuart's prior relationships that was introduced at trial on this issue. Because suppression of the evidence would have assisted Stuart's defense even more than traditional exculpatory evidence used for impeachment or refutation, we believe that in the unique context of this case, exculpatory value has therefore been established.

the missing phone logs, we believe that the district court is in the best position to decide what the proper scope of that inference should be, based on the evidence presented. The district court may determine that an inference should be drawn that the logs contained evidence of either recording or monitoring of attorney-client phone calls. On the other hand, the district court may conclude that the proper inference is only that other cryptic entries such as those made by Berry would have been found. In either event, application of an inference necessarily involves the weighing of evidence, a task exclusively reserved to the trial court. Therefore, we remand to the district court for a reweighing of the evidence employing the above-described inference in Stuart's favor.

## CONCLUSION

We hold that the district court's conclusion that the destruction of the phone logs is not attributable to the state is clearly erroneous. We also hold that the state's discovery violation operated to conceal the existence of the taping such that the destruction of the phone records is also attributable to the state as a violation of Stuart's right to due process. We therefore remand to the district court with instructions to weigh the evidence a second time giving Stuart the benefit of a favorable inference concerning the destroyed evidence.

JOHNSON and SILAK, JJ., and MEEHL, J. Pro Tem., concur.

McDEVITT, C.J., dissents without opinion.