IN THE COURT OF APPEALS OF THE STATE OF IDAHO
Docket No. 46352

| | |
|---|---|
| STATE OF IDAHO, | ) |
| | ) Filed: January 14, 2020 |
| Plaintiff-Respondent, | ) |
| | ) Karel A. Lehrman, Clerk |
| v. | ) |
| | ) THIS IS AN UNPUBLISHED |
| LENA KAYE PAGE, | ) OPINION AND SHALL NOT |
| | ) BE CITED AS AUTHORITY |
| Defendant-Appellant. | ) |
| | ) |

Appeal from the District Court of the Sixth Judicial District, State of Idaho, Bannock County. Hon. Robert C. Naftz, District Judge.

Judgment of conviction for possession of methamphetamine, vacated; order denying motion to suppress, reversed; and case remanded.

Eric D. Fredericksen, State Appellate Public Defender; Brian R. Dickson, Deputy Appellate Public Defender, Boise, for appellant. Brian R. Dickson argued.

Hon. Lawrence G. Wasden, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for respondent. Kenneth K. Jorgensen argued.

_____

BRAILSFORD, Judge

Lena Kaye Page appeals from her judgment of conviction for possession of methamphetamine, Idaho Code § 37-2732(c)(1). She asserts the district court erred in denying her motion to suppress and abused its discretion by failing to correct portions of her presentence investigation report (PSI). For the reasons set forth below, we reverse the district court's order denying Page's motion to suppress, vacate the judgment of conviction, and remand.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

Shortly before 12 a.m. on July 11, 2017, Idaho State Troopers Morey Wade and Jeff Fortner saw a car driven by Page pull over to the side of the road and stop. Trooper Wade pulled behind Page's car, activated his rear warning lights, and informed dispatch he was "doing a motorist assist." The troopers' encounter with Page is captured on a video taken by the patrol

1

car's dash camera. The video begins with Page outside of her car on the driver's side and Trooper Fortner approaching Page and meeting her at the back of her car. After a brief exchange, the video's audio begins and Trooper Fortner is heard directing Trooper Wade to "take her back here for a second," after which Page joins Trooper Wade in front of the patrol car. While Trooper Fortner approaches Page's car and engages with her passenger, Trooper Wade questions Page in front of the patrol car for approximately four minutes. During that time, Trooper Wade inquires whether Page has any weapons and she responds she has a screwdriver in her pocket, touching the outside of her right pocket to indicate the screwdriver's location.

Trooper Fortner then returns from engaging Page's passenger and directs Page to stand with Trooper Fortner off the roadway. At this point, Trooper Fortner asks Page for her identification, and she responds she does not have any identification but gives her name. While Trooper Wade returns to the patrol car to check Page's identity, Trooper Fortner continues questioning Page and, after a few minutes, walks her to the front of the patrol car, turns her to face the patrol car, and has her place her hands behind her head. Trooper Fortner then pats Page down and begins pushing items out of her right pocket.

After about a minute of pushing items out of Page's right pocket, Trooper Fortner handcuffs Page. While doing so, Trooper Fortner turns Page to face the roadside so only her right side is visible on the video. Trooper Fortner then places his hand in Page's right pocket and removes the screwdriver. He then searches Page's left pocket, which is no longer in the dash camera's view, and directs Page to "to look to the right" away from the search. While searching Page's left pocket, Trooper Fortner exclaims "there we go, there we go" and reaches to the ground to pick up an item, which is later determined to be a baggie containing methamphetamine. Trooper Fortner continues to search Page and question her for a few more minutes before Trooper Wade places Page in the backseat of the patrol car. During this time, Page is videoed by the patrol car's rear camera directed at the backseat. Approximately ten minutes after placing Page in the patrol car, Trooper Wade reads Page her *Miranda*[1] warnings.

As a result of this encounter, the State charged Page with felony possession of methamphetamine and she moved to suppress all the evidence seized and "any and all statements" she made. The district court denied Page's motion. The court ruled the troopers' initial contact with Page was justified under their community caretaking function. Further, the

---

[1]     *Miranda v. Arizona*, 384 U.S. 436 (1966).

court ruled the troopers developed reasonable suspicion to continue to detain Page to investigate further because "[t]he circumstances known to the troopers . . . provided reasonable suspicion to believe that some criminal activity was afoot." Finally, the district court ruled Page's behavior, coupled with her admission she had a screwdriver in her pocket, supported Trooper Fortner's reasonable belief that Page was armed and dangerous and justified the frisk.

After the district court denied Page's motion to suppress, she entered a conditional guilty plea, expressly reserving her right to appeal the denial of her motion to suppress. Pursuant to the plea agreement, the State agreed to recommend probation for Page. After pleading guilty, she was released on her own recognizance pending sentencing, violated the terms of her release, and was re-incarcerated. She was later released but again violated the terms of her release and was re-incarcerated. During sentencing, the State recommended the district court retain jurisdiction instead of recommending probation for Page. The district court ruled the State was free to make whatever recommendation it wanted because Page had violated the plea agreement but, regardless, the court imposed a unified four-year sentence with a one-year determinate term and placed her on probation.

Additionally during sentencing, Page noted purported inaccuracies in her PSI, including an inaccurate recitation of the facts in that section of the PSI entitled "Official Version," which sets forth facts apparently derived from the police report. The district court, however, did not make note of these inaccuracies in the PSI. Page timely appeals the district court's failure to note the inaccuracies in the PSI's "Official Version" section and the denial of her motion to suppress.

## II.

## ANALYSIS

### A. Page Preserved Her Right to Appeal the Denial of Her Motion to Suppress

As an initial matter, the State argues Page may not appeal the denial of her motion to suppress. She expressly preserved her right to appeal the denial as a condition of her guilty plea. The State, however, argues Page breached her plea agreement and, as a result, the State contends it no longer "consents" to Page's appeal. We disagree that the State may preclude Page's appeal.

Regardless of Page's breach of her plea agreement, the record clearly shows the parties at all times proceeded with the understanding that Page maintained her right to challenge the denial of her motion to suppress despite any breach. The only written document in the record

3

memorializing Page's guilty plea is a form "Guilty Plea Questionnaire," which she completed and signed.[2]  In response to the question asking Page to identify the terms of the plea agreement, she indicates she understands the terms to be that:  "[Page to] plead guilty, parties can argue sentence, joint recommendation--probation.  [Page] to be released upon entry of guilty plea."  In response to a separate question inquiring whether the plea is conditional, Page responds, "[Defendant] preserves right to appeal denial of motion to suppress."  Then, during the plea hearing, the parties confirmed Page's preservation of her right to appeal the district court's denial of her motion to suppress.

At no time was Page notified that if she were to breach the plea agreement, then she could not appeal the denial of her motion to suppress.  The questionnaire did not provide such notice.  Further, the district court did not advise Page that her right to appeal was conditioned on her compliance with the plea agreement.  Instead, at the plea hearing, the district court only advised Page that if she were to breach the plea agreement, then the State would be relieved of its obligation to recommend probation:

> [I]f you go out and get yourself charged with a new crime or fail to check in with Court Services and you have to be arrested on a bench warrant, or you don't come for sentencing, or you don't check in for presentencing investigation report--all of those little things like that--if you don't get anything like that done, *then* [*the State*] *wouldn't be bound by that recommendation for probation anymore.*

(Emphasis added.)  At the plea hearing, the prosecutor neither disputed Page's description of the parties' agreement nor the district court's statement regarding the consequences of breaching that agreement, which were limited to relieving the State of its obligation to recommend probation.

Contrary to the State's position on appeal, the record shows the parties understood Page could proceed with an appeal even if she breached the plea agreement.  After pleading guilty, Page failed to comply with the preparation of her PSI and was re-incarcerated.  After Page completed the PSI process, the State stipulated to her release and the district court entered an order stating that if Page "violates the terms and conditions of her release she will be in breach of the plea agreement.  The Court notes that [Page] reserves her right to appeal the suppression

---

[2]      Idaho Criminal Rule 11(a)(2) provides that "with the approval of the court and the consent of the prosecuting attorney, a defendant may enter a conditional plea of guilty, reserving in writing the right, on appeal from the judgment, to review any specified adverse ruling."  Even absent such a writing, however, the Court may "sustain an appeal under Rule 11(a)(2) if we can determine the nature of the appeal and the right reserved for the appeal with specificity from the record."  *State v. Andersen*, 129 Idaho 763, 764, 932 P.2d 886, 887 (1997).

issue, *even if she breaches the agreement*." (Emphasis added.) Nothing in the record indicates the State objected to this order.

Later, Page was again re-incarcerated for failing to submit to drug testing and testing positive for drugs when she did submit to testing, and she remained incarcerated until her sentencing hearing. At the sentencing hearing, the prosecutor recommended retained jurisdiction rather than probation based on Page's "failure to comply with Court Services." She disputed she had breached the plea agreement and argued the State should be bound by the plea agreement to recommend probation. After this exchange about Page's alleged breach of the plea agreement, her counsel expressly reminded the court that Page's guilty plea was conditional:

> [COURT]: Any legal reason why I shouldn't impose sentence [defense counsel]?
> [COUNSEL]: No. Just remind the Court that this is a conditional plea.
> [COURT]: Yes.

Immediately thereafter, the district court concluded Page had breached the plea agreement and ruled the State was "free to make whatever recommendation [it] wanted." At no time during the sentencing hearing, however, did the prosecutor clarify the State's purported position that Page's breach of the plea agreement rendered her guilty plea unconditional and precluded her right to appeal.

Based on the specificity of this record, we conclude the parties clearly understood at the time of sentencing that Page reserved the right to appeal the denial of her motion to suppress--even though the district court ruled she had breached the plea agreement. *See State v. Anderson*, 129 Idaho 763, 764, 932 P.2d 886, 887 (1997) (sustaining defendant's right to maintain appeal based on record). Notably, the State never conditioned Page's right to appeal on her compliance with her plea agreement. Rather, the record supports the opposite conclusion--the State allowed Page to preserve her right to appeal even though she breached the plea agreement. The State never disputed otherwise despite three separate opportunities to explain its purported understanding of the plea agreement: (1) during the plea hearing when the district court described the consequences of a breach; (2) after the district court entered an order stating Page could appeal despite any breach; and (3) at the sentencing hearing when the court

5

acknowledged the preservation of Page's right to appeal despite ruling she had breached the plea agreement.[3]

The Idaho Supreme Court has previously ruled:

[If] defense counsel proffers a description of the scope of the plea agreement, said description differing from what the prosecutor understands the agreement to encompass, the prosecutor has an affirmative duty to dispute the defendant's representation of the scope of the plea agreement, or to ask for further time to clarify the agreement.

*State v. Peterson*, 148 Idaho 593, 597, 226 P.3d 535, 539 (2010). This affirmative duty likewise includes a duty to clarify the district court's description of the scope of the plea agreement if that description differs from counsel's understanding. Because the record establishes Page could appeal the denial of her motion to suppress despite any breach of the plea agreement and the State never clarified otherwise, we consider the merits of Page's appeal.

**B.     The District Court's Factual Findings Were Clearly Erroneous**

Page appeals the district court's denial of her motion to suppress. The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact that are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999). We give

---

[3]     At oral argument on appeal, the State asserted it had no obligation to correct the trial court record to reflect the State's purported understanding (articulated only on appeal) that if Page breached her plea agreement, her guilty plea was no longer conditional. In support of this assertion, the State cited *Garza v. Idaho*, ___ U.S. ___, 139 S. Ct. 738 (2019), for the first time at oral argument for the proposition that because "no appeal waiver serves as an absolute bar to all appellate claims," *id.* at ___, 139 S. Ct. at 744, only an appellate court can determine whether Page could appeal, thereby rendering unnecessary the prosecutor's clarification of Page's appellate right before the trial court. The State's argument conflates its obligation to correct any misstatement before the trial court regarding the terms of the plea agreement with the enforceability of the terms of the agreement on appeal. Moreover, *Garza* is inapposite because it addressed trial counsel's duty to file a requested notice of appeal despite an express appellate waiver. This case does not involve such a waiver, and we see no reason to extend *Garza* to the facts of this case as the State urges. Even if *Garza* were tangentially applicable, the State's reliance on it ignores that *Garza* did not issue until several months after Page's sentencing in this case.

great deference to a trial court's credibility determinations. *State v. Miller*, 131 Idaho 288, 295, 955 P.2d 603, 610 (Ct. App. 1997). Like other factual determinations, however, a credibility determination not supported by substantial and competent evidence is clearly erroneous and must be set aside. *Stuart v. State*, 127 Idaho 806, 813-14, 907 P.2d 783, 790-91 (1995).

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. Warrantless searches are presumed to be unreasonable and therefore violate the Fourth Amendment. *State v. Weaver*, 127 Idaho 288, 290, 900 P.2d 196, 198 (1995). The State may overcome this presumption by demonstrating a warrantless search either fell within a well-recognized exception to the warrant requirement or was otherwise reasonable under the circumstances. *Id.* A detention may also be reasonable under the officer's community caretaking function. *State v. Cutler*, 143 Idaho 297, 302, 141 P.3d 1166, 1171 (Ct. App. 2006); *see also State v. Maddox*, 137 Idaho 821, 824, 54 P.3d 464, 467 (Ct. App. 2002) ("A detention is constitutionally permissible if it is reasonably conducted in furtherance of the government agent's community caretaking function.").

"The community caretaking function arises from the duty of police officers to help citizens in need of assistance." *Cutler*, 143 Idaho at 302, 141 P.3d at 1171. "Among the core community caretaking activities are the responsibilities of police to search for missing persons, mediate disputes, aid the ill or injured, and provide emergency services." *Id.* A police officer's duty of community caretaking "is totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.*

In analyzing an officer's conduct under the community caretaking function, a totality of the circumstances test is applied. *State v. Schmidt*, 137 Idaho 301, 303, 47 P.3d 1271, 1273 (Ct. App. 2002). "Community caretaking justifies a detention only if there is a present need for assistance." *Maddox*, 137 Idaho at 825, 54 P.3d at 468. "The constitutional standard is whether the intrusive action of the police was reasonable in view of all the surrounding circumstances." *Schmidt*, 137 Idaho at 303-04, 47 P.3d at 1273-74. "Reasonableness is determined by balancing the public need and interest furthered by the police conduct against the degree and nature of the intrusion upon the privacy of the citizen." *Id.* at 304, 47 P.3d at 1274. The officer "must possess a subjective belief that an individual is in need of immediate assistance, although the officer may harbor at least an expectation of detecting or finding evidence of a crime." *Id.* "The reasonableness of an officer's action in pursuit of community caretaking is to be tested upon

7

practical considerations of everyday life on which reasonable persons act." *Cutler*, 143 Idaho at 302, 141 P.3d at 1171.

A detention under the community caretaking function is distinct from an investigative detention. "An investigative detention is a seizure of limited duration to investigate suspected criminal activity." *State v. Stewart*, 145 Idaho 641, 644, 181 P.3d 1249, 1252 (Ct. App. 2008). To be lawful, an investigative detention must be supported by reasonable suspicion to believe criminal activity was afoot. *Id.* Whether an investigative detention is justified is evaluated under the totality of the circumstances known to the officer at the time. *State v. Grigg*, 149 Idaho 361, 363, 233 P.3d 1283, 1285 (Ct. App. 2010). Further, an investigative detention must be conducted in a manner reasonably related in scope to the circumstances initially justifying the detention. *Stewart*, 145 Idaho at 644-45, 181 P.3d at 1252-53. No bright line demarcates an unreasonably intrusive investigative detention from a reasonable one. Rather, "common sense and ordinary human experience must govern over rigid criteria." *Id.* at 644, 181 P.3d at 1252.

In this case, Page does not dispute that the troopers were justified under their community caretaking function to stop and inquire whether she needed assistance. Rather, Page argues the troopers immediately abandoned their community caretaking duties to conduct an investigation into criminal activity.[4] We agree.

Review of the video from the patrol car's dash camera shows that, after Trooper Fortner encounters Page behind her vehicle, he has a brief conversation with Page and directs her to stand in front of the patrol car with Trooper Wade. At that time, Page explains to Trooper Wade that Page stopped to check the car's oil. In response, Trooper Wade asks, "You been having trouble with the car lately?" to which Page replies, "Yes." Aside from this brief exchange about the nature of Page's car problem, Trooper Wade questions Page for approximately two minutes about her activities entirely unrelated to her need for assistance, including: whether she has been

---

[4] Page argues the district court "implicitly" found she was detained "at the outset of the encounter." A police officer's inquiry under the community caretaking function, however, is a form of detention, and the case law (including that to which Page cites) refers to an officer's actions in conducting his community caretaking duties as a detention. *See, e.g.*, *State v. Maddox*, 137 Idaho 821, 824, 54 P.3d 464, 467 (Ct. App. 2002) ("A detention is constitutionally permissible if it is reasonably conducted in furtherance of the government agent's community caretaking function."). We understand Page's argument to be that the troopers' detention of her from the outset was of an investigative nature rather than a caretaking nature.

at the casino, how she knows her passenger, how long she has known her passenger, whether she has had anything to drink that night, why she is wearing a glove, whether she has any weapons on her person or in her car, the name of the individual she was to meet at the casino, and the nature of her relationship to that individual. Additionally during this time, Trooper Wade offers that Page's act of stopping her car on the side of the road seems "suspicious." Only after Trooper Wade states he is suspicious and inquires about all the matters unrelated to Page's need for assistance does Trooper Wade finally ask, "Do you need assistance with the car?" to which Page responds she intends to go to a nearby friend's house for assistance. At that moment, Trooper Fortner returns to the front of the patrol car, directs Page to the side of the roadway and begins questioning her about matters again entirely unrelated to her need for assistance.

Based on this record, we conclude the community caretaking function did not justify the troopers' conduct. Importantly, the troopers' conduct was not "totally divorced from the detection, investigation, or acquisition of evidence" of criminal activity. *See Cutler*, 143 Idaho at 302, 141 P.3d at 1171. While the district court correctly ruled the troopers were justified under their community caretaking duties to stop and inquire whether Page needed assistance, its analysis ignores that an overwhelming majority of the troopers' initial contact with Page is unrelated to offering her assistance and instead directed at investigating criminal activity. Under the totality of the circumstances, the troopers' failure to focus their inquiry on the nature of Page's need for assistance and to offer that assistance renders their encounter more intrusive than necessary and, thus, unconstitutional. *See State v. McAfee*, 116 Idaho 1007, 1010, 783 P.2d 874, 877 (Ct. App. 1989) ("Although the officers may well have had a community caretaking basis to inquire as to [the defendant's] welfare, the record reflects no such inquiry before [the defendant] was ordered out of the vehicle. In so ordering, the police effected a seizure without the constitutionally required articulable reason.").

Moreover, even assuming Trooper Wade's limited inquiry about Page's car problem was reasonable and justified by the community caretaking function, the district court erred by ruling that objective, articulable facts provided reasonable suspicion "to believe some criminal activity was afoot" and to justify an investigative detention. As "objective and articulable facts" supporting a reasonable suspicion of criminal activity, the district court relied on the troopers' testimony to find that Page was "unable to stand still"; was "pacing"; was "fidgety and jittery"; had "mannerisms . . . indicat[ing] possible criminal activity"; was "occasionally glancing away";

"did not give persistent [sic] answers"; and "continued to place her hands in her pockets, even after a directive to stop." These factual findings are not supported by substantial and competent evidence and, thus, are clearly erroneous.

Review of the video belies the troopers' testimony in numerous, significant respects. Contrary to the district court's finding that Page "continued to place her hands in her pockets," the video shows her hand in her pocket only once. When Trooper Fortner initially encounters Page behind her car at the beginning of the video, the video shows her casually resting her hand in her right pocket. Almost immediately, Page removes her hand from her pocket and raises her hands in the air. Thereafter, during the approximate seven minutes between when the video begins and when Trooper Fortner begins frisking Page, she never puts either hand in her pocket, although she does touch the outside of her right pocket twice--both times in response to questions of whether she has any weapons and to indicate where her screwdriver is located.

In contrast to the video, Trooper Wade repeatedly testified Page refused to keep her hands out of her pockets, including stating that she "just kept reaching in her pockets;" "her hand motions [were] constantly going in and out of her pockets"; "she just kept reaching into her pockets over and over and over"; "she kept reaching in her pockets after telling her several times, 'Stop reaching in your pockets.' 'Keep your hands out of your pockets.'"; "she kept erratically . . . searching her pockets"; and "the continuous shifting of hands into the pockets was continuous after several times being told to keep the hands out of her pockets." Indeed, at least ten different times during the suppression hearing Trooper Wade relied on his claim that Page kept reaching into her pockets to justify the troopers' belief of reasonable suspicion of criminal activity and their concern for officer safety. Similarly, Trooper Fortner testified: "[Page] didn't want to do anything we asked--you know, we asked her this, or to do this, or stand here, keep her hands of out of her pockets. She wouldn't do anything. We just had to keep asking her over and over, you know."

Likewise, the video does not support the district court's finding that Page was "unable to stand still" and was "pacing." In the video, Trooper Fortner encounters Page behind her vehicle, tells her to stand with Trooper Wade in front of the patrol car, then tells Page to stand with Trooper Fortner off the roadway, walks Page back to the front of the patrol car, and then moves her forward until she is up against the patrol car to frisk her. The video clearly shows that Trooper Fortner directed all of these movements, either verbally or physically. Contrary to the

10

video, however, Trooper Fortner repeatedly testified during the suppression hearing that "Page [was] just walking around, not standing in one place" and she was "pacing, moving back-and-forth" "basically in between the vehicles."

The stark contrast between the video and the troopers' testimony plainly shows the district court's findings of fact are not supported by substantial evidence. The troopers' inaccurate representations about Page's purported conduct of pacing and putting her hands into her pockets also call into question the district court's other findings in support of reasonable suspicion including, for example, that Page was "fidgety and jittery"; had "mannerisms . . . indicat[ing] possible criminal activity"; and was "occasionally glancing away." The troopers' testimony regarding these alleged facts were generally associated with their false claims that Page kept putting her hands in and out of her pockets and was pacing. For that reason, the district court's remaining factual findings based on the troopers' testimony are not supported by substantial and competent evidence.

While Troopers Wade and Fortner may have been justified in stopping to inquire if Page needed assistance under their community caretaking function, they failed to undertake that duty. Moreover, they lacked reasonable suspicion of criminal activity to conduct an investigative detention. Accordingly, the district court's factual findings to the contrary are clearly erroneous, and the district court's order denying Page's motion to suppress is reversed.[5]

## C.     The District Court Abused Its Discretion by Not Correcting the PSI

Page contends that the district court erred by failing to rule on her objections to portions of the PSI. A district court's denial of a motion to strike or delete portions of a PSI is reviewed on appeal for an abuse of discretion. *State v. Molen*, 148 Idaho 950, 961, 231 P.3d 1047, 1058 (Ct. App. 2010). When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine whether the lower court:   (1) correctly perceived the issue as one of discretion; (2) acted within the boundaries of such discretion; (3) acted consistently with any legal standards applicable to the specific choices before it; and (4) reached its decision by an exercise of reason. *State v. Herrera*, 164 Idaho 261, 270, 429 P.3d 149, 158 (2018).

---

[5]     Page also argues the district court erred by failing to address her motion to suppress her statements made after she was detained but before receiving a *Miranda* warning. Because we conclude the troopers' detention of Page was unconstitutional, we do not need to address this issue. All the evidence from Page's detention--both physical and verbal--must be suppressed.

The rules of evidence are not applicable to a PSI. *State v. Rodriguez*, 132 Idaho 261, 263, 971 P.3d 327, 329 (Ct. App. 1998). The district court, in its discretion, may consider information that would otherwise be inadmissible at trial, such as hearsay, as long as the district court believes the information is reliable and the defendant has an opportunity to present favorable evidence and to explain or rebut adverse information. *State v. Carey*, 152 Idaho 720, 721, 274 P.3d 21, 22 (Ct. App. 2012). Information must be disregarded, however, if there is no reasonable basis to deem it reliable, such as when the information is simply conjecture. *Id.*

When the district court concludes information in the PSI is not reliable, this Court has ruled that the district court should "redline" the unreliable portions:

> This procedure not only ensures a clear record for review but also protects the defendant against misuse of the unreliable information in the future. The use of a PSI does not end with the defendant's sentencing. The report goes to the Department of Corrections and may be considered by the Commission of Pardons and Parole in evaluating the defendant's suitability for parole. *See* I.C.R. 32(h). In addition, if the defendant reoffends, any prior PSI is usually presented to the sentencing court with an update report from the presentence investigator. Thus, a PSI follows a defendant indefinitely, and information inappropriately included therein may prejudice the defendant even if the initial sentencing court disregarded such information. Accordingly, we recommend that the district court in this case cross out . . . those portions [of the PSI] that were disregarded by the court at sentencing and forward a corrected copy to the Department of Corrections.

*Molen*, 148 Idaho at 961-62, 231 P.3d at 1058-59 (quoting *Rodriguez*, 132 Idaho at 262 n.1, 971 P.2d at 328 n.1).

In this case, Page challenges the district court's failure to redline or otherwise note inaccuracies in the recitation of facts contained in the PSI's "Official Version" section. At the sentencing hearing and in direct response to the district court's inquiry whether the PSI needed any corrections, Page argued the recitation was inaccurate and contradicted the video of the troopers' encounter with her:

> [COURT]: . . . Any corrections that need to be made to the presentence investigation report[?]
> . . . .
> [DEFENSE]: With regard to the [official version], obviously we would object to the recitation. That's inaccurate. The Court has the video. We dispute that she kept reaching in her pockets, acting fidgety, nervous, all of those things were depicted in the video, which the Court reviewed. So the way it is recited here sounds like Ms. Page is out of control to some degree and acting erratic, and that is not what is depicted in the video, so we object to that.

12

[COURT]: Right. I understand. And, Ms. Page, it's just the police report. The police report is the police report. I watched the video. Just like [defense counsel] said, I know what happened; okay?[6]

Despite the district court's statement that it had reviewed the video, the district court did not redline or otherwise note the factual inaccuracies in the PSI's "Official Version" section. Review of the video clearly shows the information is unreliable. Among other things, Page did not keep "reaching in her pockets"; did not act "fidgety"; and was neither "angry" nor "hostile." Accordingly, we hold the district court abused its discretion by failing to redline or make notations on the PSI to correct the inaccuracies evident from the video's review.

## III.

## CONCLUSION

The district court's factual findings supporting its conclusion that the troopers' conduct was justified by their community caretaking function and that they had reasonable suspicion to conduct an investigative detention are clearly erroneous. For this reason, we reverse the district court's denial of Page's motion to suppress. Further, we hold the district court abused its discretion by failing to redline the PSI. Accordingly, we reverse the district court's ruling, vacate the judgment of conviction, and remand for further proceedings consistent with this opinion.

Chief Judge HUSKEY and Judge LORELLO **CONCUR**.

---

[6] Based on this exchange, we reject the State's argument that Page did not preserve for appeal her challenge to the PSI. The record undisputedly shows she addressed the inaccuracy at sentencing which she challenges on appeal. The State's argument that Page was required to make a formal motion to strike or to specifically ask the court to redline the PSI (versus responding to the district court's specific request that she identify any needed corrections) is inapposite and overly technical.