# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 47280

STATE OF IDAHO,

    Plaintiff-Appellant,

v.

KEITH ANTONE SARBACHER,

    Defendant-Respondent.

)
)
)
)
)
)
)
)

**Boise, September 2020 Term**

**Opinion filed: December 23, 2020**

**Melanie Gagnepain, Clerk**

Appeal from the District Court of the Second Judicial District of the State of Idaho, Nez Perce County. Jeff M. Brudie, District Judge.

The district court's order granting defendant's motion to dismiss is <u>vacated and remanded</u>.

Lawrence G. Wasden, Idaho Attorney General, Boise, for Appellant. Ken Jorgensen argued.

Eric Don Fredericksen, State Appellate Public Defender, Boise, for Respondent. Brian Dickson argued.

_____

MOELLER, Justice

This case concerns the scope of the State's constitutional duty to preserve material evidence with unknown exculpatory value in a criminal case and the consequences of its failure to do so. The State charged Keith Sarbacher with grand theft by receiving or possessing stolen property: a 2001 Dodge pickup truck. After Sarbacher's arrest, the State inventoried and photographed the truck and then returned it to the insurance company, who then sold the truck before Sarbacher's attorneys could examine it. Sarbacher moved the district court for dismissal, arguing that the State violated his constitutional right to due process by disposing of evidence that was material and potentially exculpatory. The district court granted Sarbacher's motion and dismissed the State's case. The State appeals the district court's decision because the evidence at issue was of unknown exculpatory value and the trial court expressly found that the State had not acted in bad faith. We vacate the decision of the district court and remand for further proceedings.

1

# I. FACTUAL AND PROCEDURAL BACKGROUND

On the morning of February 27, 2019, Devin Hunt spotted a vehicle in Lewiston, Idaho, that he recognized as his stolen truck. Hunt promptly called the Idaho State Police ("ISP") to make a report. Hunt described the vehicle, which had been stolen two years earlier, as a "2001 green Dodge 2500 diesel pick up [sic]." ISP Sergeant Christopher Middleton received the report and shortly thereafter saw a vehicle matching the truck's description.

Sergeant Middleton initiated a stop of the vehicle. The driver identified himself as Keith Sarbacher, and said he was en route to his first day of work for a towing company. Sarbacher was "handcuffed, pat searched, and placed in the back of the patrol vehicle." Sergeant Middleton called Hunt directly for more details about the truck. In addition to identifying unique features on the truck (*i.e.,* Hunt's custom installed parts), the Department of Transportation later matched the VIN number from the vehicle's glove box with the VIN number of Hunt's stolen truck.

While detained in the patrol car—and without being read his *Miranda*[1] rights—Sergeant Middleton questioned Sarbacher about the truck and from whom he had purchased it. Sarbacher told Sergeant Middleton that he bought the truck for $5,000 from a fellow-inmate he had met while incarcerated in Washington. Once released from prison, Sarbacher claimed he took possession of the truck from a third party about two to three months earlier. Sarbacher told Sergeant Middleton that when he initially received the truck, it lacked wheels, a hood, headlights, taillights, and it had to be rewired to start. Sarbacher also claimed he had a bill of sale for the truck at his girlfriend's house. Sergeant Middleton explained to Sarbacher that the VIN plate did not match the vehicle, the rivets holding the VIN plate were irregular, and the ignition system had been altered.

The owner of the towing company used by ISP—coincidentally Sarbacher's new employer—then arrived on the scene. Sarbacher's employer gave Sergeant Middleton conflicting information from Sarbacher's account of acquiring the truck. Meanwhile, other officers on the scene were attempting and failing to start the vehicle. Sergeant Middleton arrested Sarbacher, charging him with grand theft by receiving or possessing stolen property, in violation of Idaho Code sections 18-2403(4)(a) and 18-2407(1)(b)(1). Sergeant Middleton inventoried the truck and photographed its contents the next day.

Sergeant Middleton submitted an affidavit explaining that he called defense counsel's office on March 4, 2019, to advise them of the truck's release to Hunt's insurance company. While

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

speaking with an office assistant, he testified he heard counsel say "very plainly" in the background: "That is their problem, let them deal with it." However, Sarbacher's attorney strenuously denied this account, arguing that the State was relying on perjured testimony because he had been on a family vacation at the time the call was allegedly made. In a later affidavit, Sergeant Middleton further explained that after Sarbacher bonded out, he came to collect his personal effects on March 8, 2019. At that time, Sergeant Middleton testified that he informed Sarbacher that law enforcement would be releasing the truck to the insurance company. Sergeant Middleton asserted that he never received a request from counsel or Sarbacher to retain the vehicle. The State later delivered the truck to Hunt's insurance company on March 18, 2019, two days before Sarbacher's preliminary hearing. The insurance company sold the truck and the State's efforts to track it down were unsuccessful.

Sarbacher moved to exclude the statements he made to Sergeant Middleton while detained in the patrol car, arguing that they were in violation of *Miranda*. The district court agreed and granted his motion to exclude. Sarbacher then attempted to access the truck and arrange for an expert witness to examine it for potential exculpatory evidence, including: a search for DNA in the "grime" covering the VIN number, a rivet analysis to challenge Sergeant Middleton's testimony, and access to the truck to show there was a start-button ignition and anti-theft system. Sarbacher claims that this was when he was first informed by the State that it had already released the vehicle.

Sarbacher filed a motion to dismiss the charges against him, arguing a violation of his due process rights under the U.S. and Idaho Constitutions because the State disposed of material evidence. The State opposed the motion but "acknowledge[d] that the pick-up is material to this investigation." The district court granted Sarbacher's motion, explaining:

> Here the truck in question is clearly material to Sarbacher's defense. The vehicle was not recently stolen, and the Court has suppressed Sarbacher's responses to law enforcement questioning at the traffic stop. Therefore, the condition of and alleged physical alterations to the vehicle comprise the circumstantial foundation of the State's case.
>
> It appears that the truck was released from ISP's custody mere days after the State's first response to discovery and just prior to the preliminary hearing, providing no opportunity for Sarbacher to examine or fully investigate the evidence against him. While the Court does not find this an act of bad faith on the part of the State, it has nevertheless resulted in an irreparable infringement on Sarbacher's due process rights. Accordingly, Sarbacher's motion is granted.

The State first filed a motion for reconsideration, which the district court denied. The State then filed a timely notice of appeal. One day after the State filed this appeal, the district court denied the State's motion for reconsideration.

## II. STANDARD OF REVIEW

This Court reviews a trial court's decision regarding a motion to dismiss a criminal action for an abuse of discretion. *State v. Roth*, 166 Idaho 281, 458 P.3d 150, 152 (2020). *See also* I.C.R. 48(a) (the dismissal of a criminal action is a discretionary decision of the trial court based on its own motion or by motion of any party). In reviewing discretionary rulings, we engage in a multi-tiered inquiry to determine whether the trial court: "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

Like a motion to suppress evidence, when a decision on a motion to dismiss is challenged, "the Court accepts the trial court's findings of fact that are supported by substantial evidence, but freely reviews the application of constitutional principles to the facts as found." *State v. Bodenbach,* 165 Idaho 577, 589, 448 P.3d 1005, 1017 (2019) (quoting *State v. Moore*, 164 Idaho 379, 381, 430 P.3d 1278, 1280 (2018)). "This Court will accept the trial court's findings of fact unless they are clearly erroneous." *State v. Gonzales*, 165 Idaho 667, 671, 450 P.3d 315, 319 (2019) (quoting *State v. Purdum,* 147 Idaho 206, 207, 207 P.3d 182, 183 (2009)).

## III. ANALYSIS

On appeal, the parties primarily dispute the legal standard applied by the district court. The State contends that the district court erred by applying *Brady v. Maryland*, 373 U.S. 83, 86–88 (1963), rather than *Arizona v. Youngblood*, 488 U.S. 51 (1988). The State maintains that had the district court properly applied *Youngblood*, the court's finding that disposing of the vehicle was not "an act of bad faith on the part of the State" would have been dispositive and required that the motion to dismiss be denied. Sarbacher argues that the district court correctly applied the materiality standard from *Brady*, as articulated by the Idaho Court of Appeals in *State v. Leatherwood*, 104 Idaho 100, 103, 656 P.2d 760, 763 (Idaho Ct. App. 1982).

**A. The district erred in applying *Brady*, instead of *Youngblood*, to a case where the missing evidence was of unknown exculpatory value.**

4

"The due process clause of the Fourteenth Amendment requires that criminal prosecutions comport with prevailing notions of fundamental fairness," which "requires a meaningful opportunity to present a complete defense" and "constitutionally guaranteed access to evidence." *Lewis*, 144 Idaho at 66, 156 P.3d at 567. Thus, the State has a constitutional duty to disclose "all material exculpatory evidence known to the state or in its possession." *Id.* at 66–67, 156 P.3d 565, 567–68 (citing *Brady*, 373 U.S. 83, 86–88); *U.S. v. Agurs*, 427 U.S. 97, 111–12 (1976); *Grube v. State*, 134 Idaho 24, 27, 995 P.2d 794, 797 (2000)). As the U.S. Supreme Court held in *Brady*: "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. This is a crucial protection under the Fourteenth Amendment because it helps ensure the fair administration of justice. *Id.* at 87–88. In addition, "a constitutional violation for failure to disclose material evidence requires a showing of 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Stuart v. State*, 127 Idaho 806, 815, 907 P.2d 783, 792 (1995) (quoting *U.S. v. Bagley*, 473 U.S. 667, 682 (1985)).

While we have consistently held that *Brady* applies when the State fails to disclose *known* exculpatory evidence, we have applied a different federal precedent in cases where the State has failed to preserve material evidence of unknown exculpatory value. In *Youngblood*, a defendant accused of sexual assault lost the ability to examine potential exculpatory evidence when police failed to test and preserve semen samples collected from the victim and her clothing. 488 U.S. 51, 53–55. The Arizona Court of Appeals reversed the judgment of conviction because preserved semen samples could have exonerated the defendant. *Id.* at 54–55. The U.S. Supreme Court reversed the Court of Appeals. *Id.* The Court first explained that the police complied with *Brady* by providing police reports, laboratory results, and the criminologist's report to the defendant, as well as providing the defendant's expert with access to the swabs and clothing. *Id.* at 55. The Court then held "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58.

The U.S. Supreme Court reasoned that the Due Process Clause does not impose "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Id.*

5

We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

*Id.* While the lack of bad faith was essential to the Court's decision in *Youngblood*, it also noted the police's compliance with *Brady* in making all information and evidence otherwise accessible to the accused:

The failure of the police to refrigerate the clothing and to perform tests on the semen samples can at worst be described as negligent. None of this information was concealed from respondent at trial, and the evidence—such as it was—was made available to respondent's expert who declined to perform any tests on the samples. . . . there was no suggestion of bad faith on the part of the police. It follows, therefore, from what we have said, that there was no violation of the Due Process Clause.

*Id.*

In the case at hand, the district court looked to the *Leatherwood* case, which the Idaho Court of Appeals decided in the interim between *Brady* and *Youngblood*. It addressed "the ambit of cases where the nature of the evidence lost or destroyed can be established indirectly by other evidence or testimony." *Leatherwood*, 104 Idaho at 103, 656 P.2d at 763. In *Leatherwood*, the police failed to preserve tape recordings of telephone conversations where a restaurant patron, Fazio, called in to warn the police multiple times of an upcoming drug store robbery. *Id.* at 101, 656 P.2d at 761. A different restaurant patron overheard Fazio's phone conversations. *Id.* The witness then saw another man—later identified as Leatherwood—come to the restaurant window and knock, beckoning Fazio. *Id.* The two men left together in Leatherwood's vehicle. *Id.* Fifteen minutes later, police apprehended Fazio robbing a different drug store at gunpoint and arrested Leatherwood who was waiting in his vehicle outside the store. *Id.* Each were charged with first-degree burglary and robbery, but Leatherwood "testified that he drove Fazio to and from the drug store as a personal favor, and that he had no knowledge of any robbery until he was arrested." *Id.*

At the outset of his jury trial, Leatherwood requested the tape recordings of Fazio's telephone calls with the police but a clerical error resulted in the tapes being erased and reused. *Id.* Leatherwood moved for the dismissal of his charges, arguing the State's failure to preserve the

6

tape recordings deprived him of his right to due process. *Id.* The Court of Appeals rejected Leatherwood's argument on appeal, explaining:

> We believe that conceptually there should be—and in actuality there is now recognized to be—a unified standard of materiality in Idaho. This standard governs application of the due process clause of Art. 1, § 13, Idaho Constitution, to those cases where evidence has been withheld by the prosecution, and in those cases—like the one before us—where evidence has not been preserved, but its nature can be determined indirectly through other evidence or testimony. We hold that such evidence is "material" under this standard if, viewed in relation to all competent evidence admitted at trial, it appears to raise a reasonable doubt concerning the defendant's guilt.

*Id.* at 105, 656 P.2d at 765.

Contrary to Sarbacher's assertion on appeal, the Court of Appeals' citation to the Idaho Constitution in *Leatherwood* did not establish a new standard based solely on our constitution. *Leatherwood* largely followed *Brady* and relied on *Agurs*, a direct descendent of *Brady*. *Agurs*, 427 U.S. 97; *see Leatherwood*, 104 Idaho at 103-05, 656 P.2d at 763-65. In establishing a materiality standard, the Court of Appeals recognized the two different tests articulated by *Agurs*–one for when a specific discovery request was made and the other for when a general discovery request (or no request at all) was made. *Leatherwood*, 104 Idaho at 103, 656 P.2d at 763. If a specific discovery request was made, the evidence would be deemed material if it " 'might have affected the outcome of the trial.' " *Id.* (quoting *Agurs*, 427 U.S. at 104). If a broad request or no request was made, the evidence would be deemed material if it " 'creates a reasonable doubt that did not otherwise exist.' " *Id.* (quoting *Agurs*, 427 U.S. at 112). The court found that both tests are the same when applied to appellate review, but rejected the first test because it was such a broad and speculative approach. *Id.* at 104, 656 P.2d at 764. Instead, it adopted and applied the second test. *Id.* at 104-05, 656 P.2d at 764-65. However, the Court of Appeals explained the different standard for those cases that fall outside the ambit of *Brady*:

> [*I*]*f the nature of the evidence lost or destroyed is unknown,* and cannot be established indirectly by other testimony or evidence, *then the materiality tests are not meaningful.* In those cases, it would appear necessary to *focus primarily upon the reasonableness of the government's conduct*, placing a heavy burden upon the government to show that none of its procedures, or the conduct of its agents, has been tainted by disregard for an accused's right to a fair trial.

*Id.* at 103, 656 P.2d at 763 (emphasis added). The *Leatherwood* court applied the materiality test because, in the absence of the recordings, the restaurant patron who overheard Fazio's telephone conversations could testify as to what he heard Fazio say, thereby indirectly establishing the

7

"nature" or probative value of the missing evidence. *Id.* at 103, 656 P.2d at 763. In other words, unlike the case at bar, the *Leatherwood* court concluded the evidence had known exculpatory value.

Sarbacher argued below that article 1, section 13, Idaho Constitution provided independent state constitutional grounds to conclude Sarbacher's due process rights were violated. This argument was premised on the belief that the Court of Appeals decision in *Leatherwood*, which his attorney incorrectly attributed to the Idaho Supreme Court, did just that. However, this Court has not previously held in any case concerning evidence of unknown exculpatory value that a meaningful distinction exists between the due process guaranties in article 1, section 13 of the Idaho Constitution and the provisions of the 4th and 14th Amendments to the U.S. Constitution. A fair reading of *Leatherwood* suggests that the Court of Appeals did not find such a distinction either. We decline to find such a distinction now.

For example, the Court of Appeals has only applied *Leatherwood* in other cases where the lost evidence, "viewed in relation to all competent evidence, . . . appears to raise a reasonable doubt concerning the defendant's guilt" and "there is a reasonable probability" that disclosure to the defense would have led to a different result. *State v. Johnson*, 120 Idaho 408, 412, 816 P.2d 364, 368 (Idaho. Ct. App. 1991) (citing *Leatherwood*, 104 Idaho at 100, 656 P.2d at 760; *Bagley*, 473 U.S. at 667). In *Johnson*, the Idaho Court of Appeals analyzed the totality of the evidence and determined that the withheld police reports were "exculpatory and material" because they "may tend" to negate the elements of the defendant's criminal charge. 120 Idaho at 413, 816 P.2d at 369. However, in examining cases of lost evidence of alleged, but unknown exculpatory value, Idaho courts have followed the standard laid out in *Youngblood*. *See e.g. State v. Davis,* 165 Idaho 709, 713-16, 451 P.3d 422, 426-29 (2019); *Stuart*, 127 Idaho at 816, 907 P.2d at 793; *State v. Edney*, 145 Idaho 694, 696–97, 183 P.3d 782, 784–85 (Idaho Ct. App. 2008).

In *Paradis v. State*, a case we decided two years before *Youngblood*, we established a three-part balancing test to determine whether a defendant's due process rights were violated by the loss or destruction of evidence of unknown exculpatory value. 110 Idaho 534, 539, 716 P.2d 1306, 1311 (1986). That test requires courts to consider "(1) whether the evidence was material to the question of guilt or the degree of punishment; (2) whether the defendant was prejudiced by the loss or destruction of the evidence; and (3) whether the government was acting in good faith when it destroyed or lost the evidence." *Id.* Where the value of the evidence is known, the party asserting

8

a due process violation "has the affirmative burden of establishing the materiality and prejudice elements of the balancing test." *State v. Lewis*, 144 Idaho 64, 66, 156 P.3d 565, 567 (2007). However, where the evidence's value is unknown, "the materiality and prejudice elements are presumed and the inquiry focuses on the presence of bad faith." *Id.* "In conducting this analysis, this Court engages in a case-by-case assessment of the fault of the government and the significance of the loss or destruction to the critical elements of the defendant's case." *State v. Porter*, 130 Idaho 772, 781, 948 P.2d 127, 136 (1997). Bad faith is a high bar, requiring "more than mere negligence;" rather, bad faith refers to "a calculated effort to circumvent the disclosure requirements established by *Brady v. Maryland* and its progeny." *California v. Trombetta*, 467 U.S. 479, 488 (1984); *Lewis*, 144 Idaho at 67, 156 P.3d at 568. While "[a] deviation from normal practice can indicate bad faith," the deviation must be accompanied by additional evidence of intent and calculated efforts. *Lewis*, 144 Idaho at 67, 156 P.3d at 568.

This Court has since recognized that the test articulated in *Youngblood* encompasses our three-part inquiry established in *Paradis*, and we have applied the former. *See, e.g., Davis*, 165 Idaho at 715, 451 P.3d at 428; *Stuart*, 127 Idaho at 816, 907 P.2d at 793. Importantly, in none of these cases did this Court deem it necessary to overrule *Leatherwood*.[2] Ultimately, Sarbacher relies on *Brady* to argue that the truck was material to his case, making its loss a violation of his due process rights "irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. However, the key distinctions between *Brady* and *Youngblood* is the evidentiary value of the lost evidence: *Brady* dealt with the State's failure to disclose known exculpatory evidence while *Youngblood* dealt with the destruction of evidence of unknown exculpatory value. *See Stuart*, 127 Idaho at 816–17, 907 P.2d at 792–93 (comparing *Brady* and *Youngblood*, and applying *Youngblood* where the exculpatory value of lost evidence is unknown).

Sarbacher also relies on a plurality opinion in *State v. Fain*, 116 Idaho 82, 774 P.2d 252 (1989), *overruled on other grounds by State v. Card*, 121 Idaho 425, 825 P.2d 1081 (1991). *Fain* is a complex decision with unclear precedential value because it contains multiple concurring and dissenting opinions. In *Fain*, the defendant was convicted of first-degree murder, among other crimes. During the autopsy of the victim, a pathologist took swabs of bodily fluid but inadvertently

---

[2] Even in *Leatherwood*, the Court of Appeals noted that in cases where "the nature of the evidence is unknown, … it would appear necessary to focus primarily upon the reasonableness of the government's conduct, placing a heavy burden upon the government to show that none of its procedures, or the conduct of its agents, has been tainted by disregard for an accused's right to a fair trial." *Leatherwood*, 104 Idaho at 103, 656 P.2d at 763.

discarded them. The defendant moved for dismissal. Even though *Fain* was decided after *Paradis* and *Youngblood*, the Court applied a balancing test to affirm the trial court's conclusion that there was no violation of due process, but the defendant was entitled to a remedy less than dismissal of the case. *Fain*, 116 Idaho at 88-97, 774 P.2d at 258-67. Beyond the justice authoring the majority opinion, one justice concurred in the result of the author's opinion on this issue, one justice specially concurred, and two justices dissented. *Id.* at 100-02, 774 P.2d at 270-72. In Justice Bakes' special concurrence, he recognized the test set out by *Youngblood* and opined that because there was no evidence of bad faith, the trial court did not err in concluding the defendant's due process rights were not violated.

In this case, unlike the facts in *Leatherwood*, the truck's potential exculpatory value is unknown. Based on the record below, it would have been entirely speculative for the district court to conclude that any of the additional analyses Sarbacher wanted to conduct would have resulted in the discovery of any exculpatory evidence to exonerate him. For example, while it is possible there may have been third party DNA or fingerprints found in the grime covering the VIN plate,[3] it is highly questionable whether that would lead to any inferences that would help Sarbacher prove he had no knowledge that the vehicle was stolen. Evidence of an unknown third party's involvement in altering the VIN would not exonerate Sarbacher from the charge of receiving or possessing a stolen vehicle. An expert's rivet analysis may have challenged Sergeant Middleton's testimony regarding the alleged irregularity of the rivets he found on the VIN plate, but that would still not contradict the evidence in the record that the VIN on the windshield was different from the VIN in the glove compartment. The condition of the VIN in both locations was photographed and preserved. While evidence of the ignition system's "dead switch" starter could suggest that it was a system installed by Sarbacher following his purchase of a vehicle with an inoperable ignition, it could also demonstrate the type of tampering typical of stolen vehicles. The dead switch and steering column were also photographed and preserved by the State. Undoubtedly, the truck itself was material to the case simply by the nature of the charges—it was the veritable *corpus delicti* of the charge of grand theft by receiving or possessing this stolen vehicle. Nevertheless, the evidentiary value of the truck as the *corpus delicti* of the crime was sufficiently preserved by the State through its inventorying and photographing the vehicle prior to its release to Hunt's insurance

---

[3] Sergeant Middleton admitted to touching the plate with his finger in order to remove the grime so he could read it.

company. On the other hand, the potential exculpatory value of additional evidence tests on the truck remains unknown.

This is clearly a case that falls within the scope of *Youngblood*. Although Sarbacher is entitled to a presumption that (1) the missing truck was material evidence and (2) its loss was prejudicial to him, the unknown exculpatory value of the lost evidence necessitates that the central issue in this case is one of bad faith. *Lewis*, 144 Idaho at 67, 156 P.3d at 568. For these reasons, we conclude that the district court erred by dismissing the case pursuant to *Brady* and *Leatherwood,* rather than conducting a bad faith analysis under *Youngblood*.

**B. Inasmuch as *Youngblood* is the applicable standard, this matter must be remanded because the district court's finding of no bad faith was not supported by referencing competent evidence in the record.**

When the district court erroneously applied a *Brady* analysis to the facts of this case in granting Sarbacher's motion to dismiss, it also made a seemingly superfluous finding that the release of the truck was not "an act of bad faith on the part of the State." While such a finding was unnecessary to dismiss the case pursuant to the district court's *Brady* analysis, it would have been critical to a proper *Youngblood* analysis. The State has taken hold of that finding and now argues that it should be applied by this Court to the *Youngblood* analysis in order to reverse the district court and deny the motion to dismiss. However, the record is unclear whether the district court's comment about the lack of bad faith was intended merely as a passing observation or as a specific factual finding.

It is undisputed that seventeen days prior to the truck's disposal, Sarbacher filed a standard discovery request seeking to "inspect" any "tangible objects, which were in the possession, custody or control of the Prosecuting Attorney and which are material to the preparation of the defense or intended for use by the Prosecutor as evidence at trial, or obtained from or belonging to the Defendant." The State later explained its failure to comply with the request by asserting that Sergeant Middleton advised the defense of its intention to release the truck at least ten days before it occurred—a fact hotly disputed by the defense. The district court made no express findings as to whether it believed such testimony from the State. In reviewing the district court's ruling, we further note that there was no discussion regarding an appropriate timeline or department policy for returning stolen vehicles. While the timing of the truck's release was clearly troubling to the court, it failed to specifically address the other conflicting evidence of bad faith in the record. In fact, other than a single conclusory statement that it found there was no bad faith, the district court

11

referenced no evidence in the record to explain or support this finding. Findings of fact are clearly erroneous unless they are based on "substantial and competent evidence in the record." *State v. Ish*, 166 Idaho 492, 515, 461 P.3d 774, 797 (2020), *citing Stuart v. State*, 127 Idaho 806, 813, 907 P.2d 783, 790 (1995).

As previously noted, we grant considerable deference to a trial court's findings of fact and avoid making our own findings from the record. Here, the district court's analysis of the facts was clearly insufficient to support a *Youngblood* analysis on appeal. However, in fairness, we note that at the time it made its ruling, the district court was not conducting a *Youngblood* analysis. Therefore, based upon the unique facts of this case, we hold that the trial court's application of the wrong legal standard to the facts, coupled with its unsupported finding that this was not "an act of bad faith," requires that the district court's ruling be vacated and remanded. It is clear from the record below that the issue of bad faith will likely come down to weighing the credibility of the respective witnesses and their divergent descriptions of the events preceding disposal of the truck. Thus, we conclude that such a determination is best made by the trier of fact on remand who can personally observe the witnesses and their demeanor to assess credibility, rather than by an appellate tribunal reading from a cold record.

Sarbacher argues against a remand and urges this Court to affirm the district court's result, citing our recent decision in *State v. Hoskins*, 165 Idaho 217, 443 P.3d 231 (2019), and suggesting that the "right-result, wrong-theory" doctrine should apply. We have previously described that doctrine as follows: "Where an order of a lower court is correct, but based upon an erroneous theory, the order will be affirmed upon the correct theory." *Andre v. Morrow*, 106 Idaho 455, 459, 680 P.2d 1355, 1359 (1984) (citations omitted). However, in *Hoskins* we explained that "[t]hough it has been characterized as a 'rule,' this is a misnomer. Rather, the phrase 'right-result, wrong-theory' provides an explanation for appellate review." *Hoskins*, 165 Idaho at 217, 443 P.3d at 236. It is typically applied in cases where there is a question as to whether an issue was preserved on appeal. *Id*. However, as the State correctly points out, this concept applies to theories, not facts. In *Hoskins*, we noted that "right-result, wrong-theory" presumes that the party asserting it "developed a sufficient factual record in th[e] case." *Id*. at 217, 443 P.3d at 240.

Here, in order to apply the doctrine, we would have to resolve the issue of bad faith based on the highly disputed evidence in the record. Again, inasmuch as we believe that this type of factual determination is best made by the trier of fact, we decline the invitation to make our own

12

findings from the disputed record. Therefore, we vacate the district court's decision and remand this matter to the district court to conduct a proper *Youngblood* analysis and determine whether there was bad faith on the part of law enforcement.

## IV. CONCLUSION

The district court's decision granting Sarbacher's motion to dismiss is vacated and the case is remanded for further proceedings consistent with this opinion.

Justices BRODY and BEVAN **CONCUR.**

STEGNER, J., concurring in the result and dissenting in the analysis.

If this case only presented the applicability of the U. S. constitution's due process clause to the issue of destruction of evidence, I would concur with the majority's reasoning. As interpreted by the United States Supreme Court, a defendant cannot prove a violation of the due process clause without first showing bad faith on the part of the government. *See Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). I also agree with the majority that the Court of Appeals' decision in *State v. Leatherwood*, 104 Idaho 100, 105, 656 P.2d 760, 765 (Ct. App. 1982), did not create a standard based entirely on the Idaho Constitution that now stands in opposition to *Youngblood*. I further acknowledge that due to the posture of this case the appropriate remedy is to reverse and remand for further proceedings. I reach that conclusion because the district court erred when it decided the State's destruction of the evidence was not in bad faith and yet dismissed the charges against Sarbacher. Such a result is incongruous with *Youngblood*. However, this conclusion does not end our analysis because it does not deal with Idaho precedent, nor does it answer the question this case necessarily raises. The question presented is: does article 1, section 13, of the Idaho constitution provide greater due process protection to Idaho's citizens than its federal counterpart? There are two reasons why I believe the answer to the question is yes.

First, this Court explicitly established that Idaho's constitution required a balancing test to determine what process is due when a court is faced with the State's destruction of evidence. *See Paradis v. State*, 110 Idaho 534, 540, 716 P.2d 1306, 1312 (1986) (modification on other grounds recognized in *Stuart v. State*, 127 Idaho 806, 907 P.2d 783 (1995)). *Paradis* was decided two years before *Youngblood*, and four years after *Leatherwood*. In *Paradis*, the defendant was convicted of first-degree murder, and in post-conviction proceedings claimed his due process rights had been

13

violated when the murder victim's body had been cremated following the examination by the State's pathologist, but before the defense could conduct its own independent examination. *Paradis*, 110 Idaho at 535, 716 P.2d at 1307. This Court examined the federal and state claims separately, adopting in both claims a balancing test synthesizing several federal and state court precedents. *Id.* at 539, 716 P.2d at 1311. The *Paradis* test involved three factors: "(1) whether the evidence was material to the question of guilt or the degree of punishment; (2) whether the defendant was prejudiced by the loss or destruction of the evidence; and (3) whether the government was acting in good faith when it destroyed or lost the evidence." *Id.* Importantly, no one factor was dispositive. Although this Court later recognized that the *federal* constitutional analysis in *Paradis* had been displaced by *Youngblood*, *see Stuart v. State*, 127 Idaho 806, 816, 907 P.2d 783, 793 (1995), its creation of a state constitutional process has never been disavowed. In other words, if the federal constitution is the "floor" for due process protection, the fact that the "floor" has dropped out from underneath the "ceiling" of Idaho's constitution should not change the protection afforded a defendant by our state's constitution.

Second, even if the state constitutional analysis in *Paradis* somehow has been called into question in the intervening years, it is within this Court's power to conclude Idaho's constitution creates greater responsibility (and more process would therefore be due a defendant) for destruction of evidence by the State's actors than what has been established by the United States Supreme Court. This power should be wielded sparingly and with appropriate circumspection. Nevertheless, this is one instance in which we can and should exercise it. I think we abdicate our responsibility by blindly following the United States Supreme Court's decision in *Youngblood.*

This Court has, on multiple occasions, emphasized that the United States constitution is a floor, not a ceiling, when it comes to constitutional protections and that Idaho's constitution may provide greater protection for her citizens than does the United States constitution. *See, e.g.*, *State v. Fees*, 140 Idaho 81, 88, 90 P.3d 306, 313 (2004); *State v. Donato*, 135 Idaho 469, 20 P.3d 5 (2001); *State v. Webb*, 130 Idaho 462, 943 P.2d 52 (1997); *State v. Henderson*, 114 Idaho 293, 756 P.2d 1057 (1988); *State v. Thompson*, 114 Idaho 746, 760 P.2d 1162 (1988). Idaho has rejected the temptation to "borrow" readily defined constitutional standards from the federal courts in interpreting Idaho's constitution. *See State v. Newman*, 108 Idaho 5, 11 n.6, 696 P.2d 856, 862 n.6 (1985) ("Long gone are the days when state courts will blindly apply United States Supreme Court interpretation and methodology when in the process of interpreting their own constitutions.").

14

I think this is an instance for Idaho's courts to vary from the United States Supreme Court's jurisprudence because the protection afforded the citizenry by the United States constitution is inadequate. Not only does the holding in *Youngblood* countenance and approve negligence on the part of the State's actors, in many respects it rewards it. By my count, at least ten states have rejected the *Youngblood* standard regarding claims of due process violation with respect to lost or destroyed evidence. Some have taken issue with the *Youngblood* standard itself, noting that a bright-line, bad-faith test limits a state court's ability to reach the heart of the due process violation:

> *Youngblood* is both too broad and too narrow. It is too broad because it would require the imposition of sanctions even though a defendant has demonstrated no prejudice from the lost evidence. It is too narrow because it limits due process violations to only those cases in which a defendant can demonstrate bad faith, even though the negligent loss of evidence may critically prejudice a defendant.

*State v. Delisle*, 648 A.2d 632, 643 (Vt. 1994); *see also State v. Tiedemann*, 162 P.3d 1106, 1117 (Utah 2007). Others have focused on the unfair effect of *Youngblood*, when it "substantially increases the defendant's burden while reducing the prosecution's burden at the expense of the defendant's fundamental right to a fair trial." *State v. Ferguson*, 2 S.W.3d 912, 917 (Tenn. 1999). The consensus among those numerous states that have both carefully analyzed and rejected *Youngblood* is clear: "The fact that the police did not act in bad faith when they negligently lost the potentially exculpatory evidence *cannot in fairness be dispositive* of the issue." *Com. v. Henderson*, 582 N.E.2d 496, 497 (Mass. 1991) (italics added).

I would add to these concerns the tendency of the *Youngblood* standard to invite negligence on the part of the State's actors. When negligence is sanctioned, corresponding behavior declines. If negligence is readily forgiven, it is no longer necessary to act reasonably. Indolence is rewarded. Evidence, it must be remembered, is the cornerstone of every criminal proceeding. Allowing its negligent destruction should be roundly condemned whenever it is encountered. Courts are, at our core, truth-seeking institutions. When we lose sight of that fact we should think of another line of work. We cannot on one hand meaningfully require proof beyond a reasonable doubt and on the other reward the State for its negligent destruction of evidence, making it markedly easier to meet its significant evidentiary burden.

Given the insufficiency of the *Youngblood* standard, states providing greater protection under their own due process clauses consider the context of the entire case, rather than only analyzing whether the State's actors have acted in bad faith. Several states articulate specific

factors to be used in a balancing inquiry[1]; for example, Delaware's test examines "1) the degree of negligence or bad faith involved; 2) the importance of the missing evidence, considering the probative value and reliability of secondary or substitute evidence that remains available; and 3) the sufficiency of the other evidence used at trial to sustain [a] conviction." *Hammond v. State*, 569 A.2d 81 (Del. 1989). Others take a different view and ask if the loss or destruction of the evidence was so crucial to the defense to make the proceedings "fundamentally unfair?" *See Ex parte Gingo*, 605 So.2d 1237 (Ala. 1992); *State v. Matafeo*, 787 P.2d 671 (Haw. 1990); *see also Arizona v. Youngblood*, 488 U.S. 51, 61 (1988) (Stevens, J., concurring in the result) ("[T]here may well be cases in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair.").

Before *Youngblood* was decided, this Court utilized a standard most like that articulated in *Hammond*. When asked to apply the protection afforded by both the federal and Idaho constitutions, this Court applied a multi-factor balancing test. We were not content to simply determine if the behavior was in bad faith. *Paradis*, 110 Idaho at 540, 716 P.2d at 1312. It must be remembered that it is extraordinarily difficult to prove bad faith, making such a showing almost impossible. Yet prior to the decision in *Youngblood*, Idaho's courts did not require a showing of bad faith in order to find a due process violation. *See id.*; *see also State v. Ward*, 98 Idaho 571, 573–74, 569 P.2d 916, 918–19 (1977). The question needs to be asked: if negligence on the part of State actors was wrong prior to *Youngblood,* what makes it acceptable *post-Youngblood*? In addition, Idaho's courts looked at the effect of the loss of the evidence in the context of the other available evidence. *See Ward*, 98 Idaho at 573–74, 569 P.2d at 918–19; *Paradis*, 110 Idaho at 540, 716 P.2d at 1312. The test we found appropriate to Idaho's constitution in *Paradis* is as follows: "(1) whether the evidence was material to the question of guilt or the degree of punishment; (2) whether the defendant was prejudiced by the loss or destruction of the evidence; and (3) whether the government was acting in good faith when it destroyed or lost the evidence." *Paradis*, 110 Idaho at 535, 716 P.2d at 1307. Only after this examination could the trial court decide whether

---

[1] Of the seven states using a balancing test, five require a threshold showing before the test may be employed. Delaware, Tennessee, and West Virginia require a showing that the State had a duty to preserve evidence, as defined by the rules of criminal procedure. *Hammond v. State*, 569 A.2d 81 (Del. 1989); *Ferguson*, 2 S.W.3d 912; *State v. Osakalumi*, 461 S.E.2d 504 (W.Va. 1995). Similarly, Massachusetts and Utah require a showing that there is a "reasonable possibility" that the evidence would be favorable (Massachusetts) or exculpatory (Utah). *Henderson*, 582 N.E.2d 496; *Tiedemann*, 162 P.3d 1106.

the proceeding was rendered so fundamentally unfair by the loss or destruction of the evidence as to require dismissal of charges.

This is not to say that the loss of all evidence will merit dismissal of charges, regardless of the relative culpability of the State's actors. As stated by the Connecticut Supreme Court, "The trial court [should] not [be] faced with the Hobson's choice of either dismissing all criminal charges or denying any relief whatsoever to a criminal defendant who possibly has been prejudiced as a result of the negligence of the state." *State v. Morales*, 657 A.2d 585, 595–96 (Conn. 1995). Instead, the trial court should determine the appropriate remedy in an exercise of its discretion.

> The touchstone for the balancing process is fundamental fairness. If the behavior of the State in a given case is so reprehensible as to warrant sanction, a sanction might be available even where prejudice to the defendant is slight or only speculative. If prejudice to the defendant, on the other hand, is extreme, fairness may require sanction even where there is no wrongdoing on the part of the State. In between those extremes, we have confidence that trial judges can strike a balance that preserves defendants' constitutional rights without undue hardship to the prosecution.

*State v. Tiedemann*, 162 P.3d 1106, 1117 (Utah 2007). The Tennessee Supreme Court cautions that dismissal is "but one of the trial judge's options. The trial judge may craft such orders as may be appropriate to protect the defendant's fair trial rights." *State v. Ferguson*, 2 S.W.3d 912, 917 (Tenn. 1999) (suggesting as an example that a defendant's rights may be protected by instructing the jury that it is proper to infer that lost or destroyed evidence would be favorable to the defendant).

For the reasons stated, I agree with the majority that the proper remedy is to remand this case for further proceedings. However, I view *Youngblood* as falling far short of the due process protections afforded by Idaho's constitution. To conclude that Idaho's police and prosecutors may *negligently* destroy evidence in a criminal case is neither just nor fair. The holding of *Youngblood* is troubling and has prompted numerous states in the years since its decision to reject its adoption when it comes to state due process challenges. Accordingly, I concur in the result but respectfully dissent from the reasoning articulated by the majority. I would remand for further proceedings, but I would reject *Youngblood* and take Idaho's jurisprudence on a fairer, more just path.


Chief Justice BURDICK concurs.

17